William E. WHITESIDE, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 373–89 T.

United States Claims Court.

June 5, 1992.

Christian S. Daghir, Harrisburg, Pa., for plaintiff.

Scott Putney, David Gustafson, Dept. of Justice, Tax Div., Claims Court Section, with whom were Mildred L. Seidman, and Shirley D. Peterson, Asst. Atty. Gen., Washington, D.C., for defendant.

## OPINION

HORN, Judge.

## BACKGROUND

Plaintiff, William Whiteside, brings this action for the refund of one-hundred (100) dollars in federal trust fund taxes, paid to the defendant, the United States, in this case the Internal Revenue Service. The defendant has counterclaimed for the unpaid portion of taxes due, in the amount of $140,063.67, assessed against plaintiff Whiteside pursuant to section 6672 of the Internal Revenue Code of 1954, 26 U.S.C. § 6672 (1988), for the allegedly unpaid trust fund taxes of General Freights, Inc. for two tax quarters ending December 31, 1983, and March 31, 1984.

## FACTS

General Freights, Inc., a Maryland corporation, formerly located in Hagerstown, Maryland, was a trucking company in the business of hauling freight. The President and principal stockholder of General Freights was James Meyers.

Plaintiff, William Whiteside, began working at General Freights in July, 1983, ostensibly as a transportation supervisor.

Prior to taking the position with General Freights in July, 1983, Whiteside had been employed, since April, 1982, at Highway Petroleum Sales, Inc., a company also owned by Meyers. At Highway Petroleum Sales, Whiteside was employed as a transportation supervisor, responsible for setting up a maintenance and safety program for road and taxi drivers. Although transferred to the General Freights' payroll in July, 1983, Whiteside physically remained at the Highway Petroleum Sales location until October 3, 1983. Plaintiff alleges that when transferred to General Freights, his title and duties were merely those of a transportation supervisor, and that they did not change from his duties at Highway Petroleum Sales. Defendant, however, alleges that Whiteside represented himself, held himself out as, and effectively was Vice President and General Manager of General Freights.

The parties in the above-captioned case stipulated to the following key facts prior to trial. General Freights failed to pay over to the federal government the trust fund taxes due from employee withholdings for the fourth quarter of 1983 and the first quarter of 1984. The I.R.S. then assessed a one-hundred (100) percent penalty against plaintiff Whiteside, for unremitted trust fund taxes, in the amounts of $76,847.71 for the fourth quarter of 1983 and $63,215.96 for the first quarter of 1984. On February 18, 1988, the I.R.S. issued to plaintiff a Statement of Tax Due on Federal Tax Return, notifying plaintiff of tax due as a "responsible person of General Freights," and demanding the payment of $140,063.67 from the unremitted trust fund. On March 7, 1988, plaintiff paid $100.00 of the penalty assessed against him under 26 U.S.C. § 6672. On or about March 28, 1988, plaintiff timely filed two claims for refund (Form 941) with the I.R.S. asserting entitlement to a refund of the $100.00 paid against the assessed penalties.

Plaintiff then filed suit in this court seeking refund of $100.00 and invalidation of the remaining assessment. Defendant counterclaimed for the unpaid portion of

the trust fund taxes of General Freights, Inc. for the fourth quarter of 1983 and the first quarter of 1984 in the amount of $140,063.67. A trial was held at which the plaintiff offered three witnesses in his direct case. The defendant chose to rest after the completion of the plaintiff's case, without offering additional testimony.

## DISCUSSION

The defendant, the United States of America, alleges that the plaintiff was a "responsible person" under the Internal Revenue Code of 1954, 26 U.S.C. §§ 6671(b) and 6672 (Code). The defendant further maintains that plaintiff willfully failed to pay over trust fund taxes to the government and is, therefore, not entitled to a refund of the $100.00 previously paid. The government has, instead, counterclaimed against the plaintiff for the unpaid portion of the trust fund taxes in the amount of $139,963.67.

The Joint Statement of Issues of Fact and Law, filed on behalf of both parties on March 5, 1991, set out the following issues to be decided:

1. Whether, for purposes of Section 6672 of the Internal Revenue Code, plaintiff was a responsible person with respect to the unpaid, withheld employment taxes of General Freights, Inc.

2. Whether, for purposes of Section 6672 of the Internal Revenue Code, plaintiff willfully failed to collect, or truthfully account for and pay over the stated unpaid, withheld employment taxes, or willfully attempted in any manner to evade or defeat any such tax or the payment thereof.

3. Whether plaintiff is entitled to a refund of the amount paid with respect to the assessments in issue made against him under Section 6672 of the Internal Revenue Code.

4. Whether plaintiff is liable to defendant for any or all of the amounts claimed by defendant in its counterclaim.

The parties dispute the nature of plaintiff Whiteside's status, duty and authority at General Freights and, therefore, his responsibility for paying the trust fund taxes.

Defendant lists, among other indicia of plaintiff's position as a "responsible person" with General Freights, that plaintiff Whiteside held himself out as an officer of General Freights on letters, bank signature cards and even on a trust fund tax return (Form 941) filed with the I.R.S. Moreover, according to the defendant, plaintiff Whiteside had the authority to pay creditors, and paid creditors other than the I.R.S. with scarce corporate funds, despite his knowledge that the trust fund taxes were owed. Plaintiff, on the other hand, argues that he should not be held liable for paying the trust fund taxes, that paying these taxes was not among his duties, and that he lacked the requisite status, duty and authority in the corporation to make him a responsible person for purposes of section 6672.

## I. Burden of Proof

In a tax refund case, there is a strong presumption of the correctness of the findings of the Commissioner of Internal Revenue. The taxpayer has the burden of rebutting that presumption of correctness and of establishing entitlement to a specific amount of a deduction claimed. *United States v. Janis,* 428 U.S. 433, 440–41, 96 S.Ct. 3021, 3025–26, 49 L.Ed.2d 1046 (1976); *Helvering v. Taylor,* 293 U.S. 507, 514, 55 S.Ct. 287, 290, 79 L.Ed. 623 (1935); *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933); *Danville Plywood Corp. v. United States,* 899 F.2d 3, 7–8 (Fed.Cir.1990); *L.W. Hardy Co. v. United States,* 1 Cl.Ct. 465, 470 (1982); *Young & Rubicam, Inc. v. United States,* 187 Ct.Cl. 635, 654–55, 410 F.2d 1233, 1244–45 (1969). In order to overcome this presumption, the taxpayer has the burden of presenting "substantial evidence as to the wrongfulness of the Commissioner's determination." *KFOX, Inc. v. United States,* 206 Ct.Cl. 143, 151–52, 510 F.2d 1365, 1369 (1975) (citing *Comm'r v. Riss,* 374 F.2d 161 (8th Cir.1967)). The burden imposed on a plaintiff is both the burden of going forward and the burden of persuasion. A plaintiff first must come forward with enough evidence to support a finding contrary to the Commissioner's determination.

*Danville Plywood Corp.*, 899 F.2d at 7–8; *Transamerica Corp. v. United States*, 902 F.2d 1540, 1543 (Fed.Cir.1990). But, even after satisfying the burden of going forward, a plaintiff must still carry the ultimate burden of proof. *Id.*

In the instant case, the Commissioner has determined that plaintiff Whiteside is a "responsible person" and is liable for the trust fund taxes due and owing for General Freights. Therefore, as stated eloquently by my colleague, Judge Lydon, in *Pototzky v. United States:*

> The burden of proving whether plaintiff is a 'responsible person' falls upon the plaintiff. Clearly, the taxpayer has the burden of proof as to his claim for a refund. The general rule would place the burden of proof on the government to prove its counterclaim. However, the court in *Psaty v. United States*, 442 F.2d 1154, 1159–60 (3d Cir.1971), found that the presumptive correctness afforded to the Commissioner's assessment determination allows the government to establish a *prima facie* case of liability merely by offering into evidence a certified copy of the assessment. *See also Adams v. United States*, 175 Ct.Cl. 288, 301–02, 358 F.2d 986, 994 (1966). Once that *prima facie* case is made out both the burden of going forward with evidence and the ultimate burden of persuasion shifts to the plaintiff. *Psaty v. United States, supra*, 442 F.2d at 1160. *See also Lesser v. United States*, 368 F.2d 306 (2d Cir. 1966); *United States v. Lease*, 346 F.2d 696 (2d Cir.1965); *United Aniline Co. v. Commissioner*, 316 F.2d 701 (1st Cir. 1963). *But see United States v. Molitor*, 337 F.2d 917, 922–23 (9th Cir.1964). Therefore, the general rule is that plaintiff must prove by a preponderance of the evidence that he is not a 'responsible person,' and thus defendant's assessment is erroneous. *Psaty v. United States, supra*, 442 F.2d at 1160; *Datlof v. United States*, 252 F.Supp. 11 (E.D.Pa.1966), *aff'd*, 370 F.2d 655 (3d Cir.1966), *cert. denied*, 387 U.S. 906, 87 S.Ct. 1688, 18 L.Ed.2d 624 (1967).

*Pototzky v. United States*, 8 Cl.Ct. 308, 315 (1985).

The government's *prima facie* case is proved by the introduction into evidence of properly certified copies of the assessment. *Adams v. United States*, 175 Ct.Cl. 288, 301–02, 358 F.2d 986, 994 (1966). In the case at bar, the parties have stipulated to the assessments at issue, thereby agreeing to the fact of the assessment and establishing the government's *prima facie* case. The stipulation entered into by the parties reads as follows:

> The trust fund portions of the employment tax delinquencies/assessments of General Freights, Inc. for the quarters in issue are:

| Tax Quarter Ended | Penalty Amount |
| --- | --- |
| 12/31/83 | $ 76,847.71 |
| 03/31/84 | 63,215.96 |
| | $140,063.67 |

On February 18, 1988, the Internal Revenue Service timely assessed a 100% penalty pursuant to Section 6672 against William E. Whiteside in the amount of $140,063.67 with respect to the trust fund portion of the employment tax liabilities of General Freights, Inc. for the quarters ended December 31, 1983, and March 31, 1984.

On February 18, 1988, the Internal Revenue Service issued to plaintiff a Statement of Tax Due on Federal Tax Return, notifying plaintiff of tax due and requesting the payment of $140,063.67.

The burden in this case, therefore, is on plaintiff to prove, by a preponderance of the evidence, that the Commissioner's determination that plaintiff Whiteside was a "responsible person," who willfully interfered with remittance of the trust fund taxes and is, therefore, liable for the unremitted taxes, is erroneous. As is explained more fully below, plaintiff must prove that he was not a "responsible person" under the applicable law and, therefore, that he was not under a duty to collect, truthfully account for and pay over the trust fund taxes under section 6672 of the Code, 26 U.S.C. § 6672. If the plaintiff, however, is found to be a responsible person, then the plaintiff must also be adjudicated as having willfully failed to collect, truthfully account for and pay over trust

fund taxes to the I.R.S., or, as having evaded or defeated the tax or tax payments which were due and owing. Both the statutory elements of responsible person and willfulness must be present before the 100 percent penalty can be imposed. *Godfrey v. United States,* 748 F.2d 1568, 1574 (Fed. Cir.1984).

## II. Responsible Person

The Tax Code requires employers to withhold from the paychecks of their employees money representing employees' personal income taxes and Social Security Taxes. 26 U.S.C. §§ 3102(a), 3402(a) (1988). "Because federal law requires employers to hold these funds in a special fund in 'trust for the United States,' 26 U.S.C. § 7501(a), these taxes are commonly referred to as 'trust fund' taxes." *United States v. Energy Resources Co.,* 495 U.S. 545, 546–47, 110 S.Ct. 2139, 2140, 109 L.Ed.2d 580 (1990) (citing *Slodov v. United States,* 436 U.S. 238, 242–43, 98 S.Ct. 1778, 1782–83, 56 L.Ed.2d 251 (1978), *superceded* by statute on a bankruptcy issue). Should employers fail to pay trust fund taxes, the Government may collect an equivalent sum directly from the officers or employees of the employer who are responsible for collecting the tax. 26 U.S.C. § 6672. These individuals are commonly referred to as "responsible" individuals. *United States v. Energy Resources Co.,* 495 U.S. at 546–47, 110 S.Ct. at 2140–41 (citing *Slodov,* 436 U.S. at 244–45, 98 S.Ct. at 1783–84).

The pertinent Tax Code sections in the instant case are:

§ 6671. Rules for application of assessable penalties

(a) Penalty assessed as tax.—The penalties and liabilities provided by this subchapter shall be paid upon notice and demand by the Secretary, and shall be assessed and collected in the same manner as taxes. Except as otherwise provided, any reference in this title to 'tax' imposed by this title shall be deemed also to refer to the penalties and liabilities provided by this subchapter.

(b) Person defined.—The term "person", as used in this subchapter, includes an officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee, or member is under a duty to perform the act in respect of which the violation occurs.

§ 6672. Failure to collect and pay over tax, or attempt to evade or defeat tax.

(a) General rule.—Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the·tax evaded, or not collected, or not accounted for and paid over. * * *.

It has been written that "[t]he purpose of the 100 percent penalty provision 'is to permit the taxing authority to reach those [persons] responsible for the corporation's failure to pay the taxes which are owing.'" *Godfrey,* 748 F.2d at 1574 (quoting *White v. United States,* 178 Ct.Cl. 765, 771, 372 F.2d 513, 516 (1967)). "'[I]t is evident from the face of the section [section 6672] that it was designed to cut through the organizational form and impose liability upon those actually responsible for an employer's failure to withhold and pay over the tax.'" *Id.* (quoting *Pacific National Insurance Co. v. United States,* 422 F.2d 26, 31 (9th Cir.), *cert. denied,* 398 U.S. 937, 90 S.Ct. 1838, 26 L.Ed.2d 269, *reh'g denied,* 400 U.S. 883, 91 S.Ct. 116, 27 L.Ed.2d 121 (1970)). As the Court of Appeals for the Ninth Circuit commented in *Pacific National Insurance:*

It would frustrate this purpose needlessly to imply a condition limiting the application of the section to those nominally charged with controlling disbursements of a corporate employer, thus immunizing those who, through agreement with or default of those nominally responsible, have exercised this corporate function in fact.

*Pacific National Insurance Co. v. United States,* 422 F.2d 26, 31 (9th Cir.1970).

In *Godfrey,* the Court of Appeals for the Federal Circuit affirmed that responsibility

to pay over the trust fund taxes may rest with more than one employee or officer of a corporation which fails to withhold and pay employment taxes. The Federal Circuit, quoting the Claims Court in *White v. United States*, 178 Ct.Cl. at 771, 372 F.2d at 516, wrote:

'[T]he section [6672] is generally understood to encompass all those officers who are so connected with a corporation as to have the responsibility and authority to avoid the default which constitutes a violation of the particular Internal Revenue Code section or sections involved, even though liability may thus be enforced on more than one person.' *White v. United States*, 372 F.2d at 516. *See also Feist v. United States*, 607 F.2d 954, 960, 221 Ct.Cl. 531 (1979); *Bolding v. United States*, 565 F.2d 663, 671, 215 Ct.Cl. 148 (1977); *Burack v. United States*, 461 F.2d 1282, 1291, 198 Ct.Cl. 855 (1972); *accord McCarty v. United States*, 437 F.2d [961] at 967 [194 Ct.Cl. 42]; *Scott v. United States*, 354 F.2d 292, 296, 173 Ct.Cl. 650 (1965).

*Godfrey*, 748 F.2d at 1575.

■ The issue of whether a person is a responsible individual with ultimate authority under section 6672 of the Code, 26 U.S.C. § 6672, is a question of fact which " 'hinges upon the application of the relevant facts to the ... pertinent provisions of the Internal Revenue Code of 1954.' " *Godfrey v. United States*, 748 F.2d at 1575 (quoting *Bauer v. United States*, 543 F.2d 142, 144, 211 Ct.Cl. 276 (1976)). The Federal Circuit's *Godfrey* decision sets forth in detail the several fact questions to be examined when determining whether an individual is actually responsible for an employer's failure to withhold and pay over trust fund taxes. *Godfrey*, 748 F.2d at 1568. These factors have been appropriately described as falling into three categories: status, duty, and authority. *Howard v. United States*, 711 F.2d 729, 734 (5th Cir.1983) (citing *Mazo v. United States*, 591 F.2d 1151, 1156 (5th Cir.1979) (stating that responsibility is "a matter of status, duty and authority, not knowledge"), *cert. denied*, 444 U.S. 842, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979)); *see also Godfrey*, 748 F.2d at

1575; *Hammon v. United States*, 21 Cl.Ct. 14, 24 (1990). Therefore, any person with sufficient status, duty, and authority who, under the *Godfrey* test, could "avoid default" regarding payment of the trust taxes, is to be considered a responsible person under section 6672. *See Godfrey*, 748 F.2d at 1575; *White*, 178 Ct.Cl. at 771, 372 F.2d at 516.

When determining what authority an individual had over the financial affairs of a company, the Court of Appeals for the Federal Circuit has held that courts should look through corporate titles and focus on the individual's actual authority or control. In *Godfrey v. United States*, the Federal Circuit stated that:

The overwhelming weight of case precedent requires the factfinder to look through the 'mechanical functions of the various corporate officers,' [citations omitted] to determine the persons having 'the power to control the decision making process by which the employer corporation allocates funds to other creditors in preference to its withholding tax obligations.' [citations omitted] The inquiry required by the statute is 'a search for a person with ultimate authority over expenditure of funds since such a person can fairly be said to be responsible for the corporation's failure to pay over its taxes. [citations omitted]'

*Godfrey*, 748 F.2d at 1575. "The inquiry must focus on actual authority to control, not on titles or trivial duties." *Heimark v. United States*, 18 Cl.Ct. 15, 23 (1989).

■ The determination of responsibility is a test of substance, not merely form. *Godfrey*, 748 F.2d at 1576. Therefore, this court must carefully weigh the facts presented by the instant case to determine if plaintiff Whiteside had the status, duty, and authority to give him " 'the power to control the decision-making process by which the employer corporation allocates funds to other creditors in preference to its withholding tax obligations.' " *Id.* at 1575 (quoting *Haffa v. United States*, 516 F.2d 931, 936 (7th Cir.1975)). Stated differently, this court must ascertain if the plaintiff had sufficient status, duty, and authority

to be "'a person with ultimate authority over expenditure of funds since such a person can fairly be said to be responsible for the corporation's failure to pay over its taxes.'" *Id.* (quoting *White,* 178 Ct.Cl. at 772, 372 F.2d at 517). As the Court of Claims wrote in *White:*

> In reaching a determination with respect to the person or persons upon whom to impose responsibility and liability for the failure to pay taxes, the courts tend to disregard the mechanical functions of the various corporate officers and instead emphasize where the ultimate authority for the decision not to pay the taxes lies.

*White v. United States,* 178 Ct.Cl. at 771, 372 F.2d at 516.

■ Initially, the court feels compelled to offer a few comments regarding the credibility of the witnesses who offered testimony at trial. The plaintiff presented three witnesses, Edward N. Button, James J. Shirey, and the plaintiff, William E. Whiteside, as his direct case. The testimony of two of those witnesses, Button and Shirey, was extremely brief. At the end of the plaintiff's case, the defendant rested and chose to present no additional witnesses or evidence for the record.

Edward N. Button, who at one point was corporate counsel for General Freights, was essentially a one issue witness. He was called to testify regarding minutes of two General Freights' Board of Directors' meetings he signed as Secretary of the meetings. Through his testimony, plaintiff was apparently trying to establish that Whiteside had not been elected officially as a corporate officer.

With respect to the witness, James J. Shirey, the court has serious reservations as to his credibility and as to the probity of his testimony, given his frequently self-contradictory remarks, his repeated vague answers and responses that he did not remember, and the fact that he vaguely defined his duties at General Freights when

he testified that he was a "conptroller [sic] most of the time." Mr. Shirey also testified that he did not work with plaintiff Whiteside a lot, and testified that this was because their offices were in two different physical locations. Moreover, at the outset of his testimony, Shirey testified that plaintiff Whiteside was "involved in the trucking aspect of the company ... involved in maintenance basically maintenance of those trucks." Later, in his testimony, however, he said that plaintiff Whiteside took over the duties of Allen Rogers, who held the title Vice President. Within the short span of his testimony, Shirey stated that he did not know whether plaintiff Whiteside was a Director of General Freights; what authority plaintiff Whiteside had to enter into contracts on behalf of General Freights; or what authority plaintiff had to make purchases of equipment or vehicles. Shirey also testified about a meeting between General Freights and the I.R.S. Although he stated that he did not know who was present, shortly thereafter, he testified that Whiteside was definitely not present. Likewise, Shirey testified unequivocally that plaintiff Whiteside was not involved in the preparation of the payroll, although at his earlier deposition he had stated that "I don't remember who did the payroll or did the general payables."

With respect to plaintiff Whiteside's official status at General Freights, Inc., there is conflicting testimony in the record. The plaintiff offered the testimony of Edward Button, the corporate counsel for General Freights, to show that plaintiff Whiteside was not officially elected by the Board of Directors to a corporate position at General Freights which carried a title. Button's testimony, however, only covers the minutes of two "annual" Board of Directors' meetings, one on April 18, 1983 and one on May 5, 1983.[1] The April 18, 1983 minutes list the following "Officers of the Corporation": James G. Meyers, Slot A, Betty Meyers, Slot B, Allen Rogers, Slot C. The May

---

1. Strangely enough, the two sets of minutes both include the word "annual" in the caption, although the meetings occurred within less than a month of each other. The April 18, 1983 minutes are titled "Annual and Special Meeting of General Freights, Inc." and the May 5, 1983 minutes are titled "Annual Board of Directors' Minutes." The May 5, 1983 minutes make no mention of the recent April meeting.

5, 1983 minutes, however, show the officers listed as James Meyers, President and Allen Rogers, Vice President and Treasurer. Because the two sets of annual minutes are for meetings which occurred within a month of each other, the court is hard pressed to conclude that the officers of General Freights listed on May 5, 1983, were necessarily the same at the end of 1983 and the beginning of 1984, the two quarters at issue in the instant case. Moreover, there is no testimony in the record to indicate that a subsequent Board of Directors' meeting did not occur before March 31, 1984, once again changing the official corporate directorship of General Freights.

Whiteside maintains that his duties were not those of a corporate officer, but were limited only to those of transportation supervisor. According to his testimony, the duties of the transportation supervisor included overseeing the maintenance of the approximately 200 vehicles owned by the company, supervising the drivers and mechanics, and contracting with suppliers and repair shops.

Plaintiff attempted to further prove his limited role by testifying that other employees were responsible for overseeing the company's finances and that he was not involved in the day to day oversight of General Freights' finances. From the record it appears that Whiteside is trying to maintain that most of the decisions regarding payment of creditors were made by Meyers, although Whiteside's answers on this issue were particularly evasive and contradictory. At one point in his testimony, plaintiff stated that Meyers made all those decisions; later, he said he had authority to pay some creditors; and then still later, he stated Arlene Graf made up a list of payables and those he (Whiteside) was authorized to pay, he paid. Additionally, on direct examination, plaintiff Whiteside explained that General Freights employed a CPA, Leonard Freitek, to manage the bookkeeping. However, on cross-examination, counsel for the defendant questioned Whiteside regarding his earlier deposition when Whiteside had identified Freitek as a clerk who took care of the payroll.

Defendant contends that on October 3, 1983, Whiteside effectively became and assumed the duties of Vice President and General Manager of General Freights, when he delivered a dismissal letter from General Freights' President James Meyers, to then Vice President, Allen Rogers. Defendant argues that Whiteside apparently filled Rogers' shoes and assumed the responsibilities, status and duties commensurate with the position of Vice President, including using the office Rogers formerly occupied, acquiring check signing authority and assuming the responsibility to supervise the payment of expenses.

Although it is true that the limited Board of Directors' minutes introduced into the record do not indicate that Whiteside was formally elected as a director or corporate officeholder of General Freights, and the plaintiff testified that he was not a corporate officer, the record clearly establishes that plaintiff Whiteside, in addition to his duties as a transportation supervisor, also performed management and financial duties for General Freights, and that in a number of ways he held himself out in the community as the Vice President of General Freights.

The documents introduced into the record establish that William Whiteside did in fact have authority and control over General Freights' corporate finances. Bank signature authority cards from two different banks, on a variety of different type accounts—payroll account, claims account, and general account—were offered into evidence. Two signature authority cards introduced into evidence from the Suburban Bank in Hagerstown, Maryland, list William E. Whiteside as Vice President and one account lists Whiteside without a title, but on which account James Meyers, the President of General Freights, does not even appear on the card as authorized to sign. On the two types of accounts at the Citizens National Bank of Greencastle, Pennsylvania, plaintiff Whiteside is also listed as authorized to sign on each account.

Over one-thousand (1,000) checks written on General Freights bank accounts during the tax quarters at issue here were introduced into evidence by the defendant during the trial in plaintiff Whiteside's case. An examination of these checks shows that Whiteside's signature is on each of the seven-hundred thirty-five (735) checks in evidence as defendant's exhibit 2004 written on General Freights' "General Account" with Suburban Bank of Hagerstown, Maryland, during the last quarter of 1983, as well as on the one-hundred eighty-three (183) checks in evidence as defendant's exhibit 2009A written on both the "General Account" with Suburban Bank and General Freights' account with the Citizens National Bank of Greencastle in Greencastle, Pennsylvania, during the first quarter of 1984.

The checks included in defendant's exhibit 2004 and 2009A were paid to cover debts for such things as General Freights' rent, utilities, janitorial services, fuel costs, and maintenance of vehicles. However, checks from these accounts were also used to meet many of General Freights' tax obligations. Fuel-use taxes were paid from these accounts to the "Treasurer of State Ohio," "WVA Tax Dept. (Motor Fuel)," "Div. of Motor Fuel Tax–Del.," and "N.C. Dept. of Rev. Gas Tax." In addition, payments from these accounts were made to the "Pa. Dept. of Revenue," "Treas. of VA Rich., VA," "N.Y.S. Dept. of Taxation and Fin.," "VA Dept. of Taxes (State Tax)," "State Tax Conn, S/C," "Comptroller of Treasury [MD]," "WVA Tax Depart.," "Dept. of Rev. Serv. (Conn.)," and "Md State Tax Dept." Checks from these accounts were also written to the "Virginia Emp. Comm.," the "Maryland Unemployment Ins. Fund," and the "Internal Revenue Ser."

In light of the numerous checks signed by plaintiff Whiteside to cover the tax obligations of General Freights, the court finds plaintiff's claim that he was unaware of a responsibility to pay over trust fund taxes or that he did not have the authority to do so, to be disingenuous. The plaintiff's argument is further undermined by the fact that he signed no less than sixteen checks paying money over to the General Freights' payroll account during the tax quarters at issue. He also signed one-hundred nineteen (119) paychecks for General Freights' employees during the first quarter of 1984.[2]

Whiteside also appears to have had oversight and day to day involvement with the company's financial management, including a supervisory role over the clerical employees, such as Graf and Freitek, who received the bills, prepared the checks and entered the debits and credits in the company books. In addition, there is no question that Whiteside had authority to fire all drivers and mechanics at General Freights, who appear to have made up the majority of the workforce. Moreover, in deposition testimony given before the trial, Shirey, a witness for the plaintiff, testified that it was his belief that Whiteside was basically a manager of General Freights, Inc. and that he controlled the day-to-day operations and management of General Freights. Shirey also testified that Whiteside approved the invoices for payment processing.

Plaintiff Whiteside's self-serving statements notwithstanding, the record would seem to support the defendant's position that, perhaps without benefit of title, the plaintiff did in fact exercise sufficient control and authority over financial matters so as to be considered a responsible person under section 6672. Among the most important indicia of Whiteside's controls over relevant financial matters was his admission that he had check signing authority at General Freights and that he had the authority to sign the payroll for company

---

**2.** The Federal Circuit has held that "where a person has authority to sign the checks of the corporation, [citations omitted] or to prevent their issuance by denying a necessary signature, [citations omitted] or where that person controls the disbursement of the payroll, ... he will generally be held 'responsible.'" *Godfrey,* 748 F.2d at 1576. However, "[t]he mechanical duties of signing checks and preparing tax returns are thus not determinative of liability under § 6672." *Godfrey,* 748 F.2d at 1575; *DiStasio v. United States,* 22 Cl.Ct. 36, 45 (1990); *Heimark v. United States,* 18 Cl.Ct. at 22.

employees. The court notes that Whiteside's signature is the only one authorized for each of the company accounts introduced into the record, a fact not true even with respect to the company's President, James Meyers.

Critical to the instant case is the fact that plaintiff had wide ranging authority to pay a variety of General Freights' many creditors, and even to fulfill the company's tax obligations. Plaintiff clearly had the ability to select which creditors of General Freights' to pay and also had authority to contract with some suppliers. Although it appears that there were some bills which plaintiff Whiteside did have to send for approval to Mr. Meyers, the record reflects many, many other bills plaintiff had authority to pay on his own. It is, therefore, odd that on direct examination, when asked what bills he had authority to sign, plaintiff limited his answer to terminal expenses, the expense account, advances to drivers on the road and certain suppliers, without mentioning payroll requirements.

### III. Willfulness

■ Responsibility, however, is only one part of the test for liability under section 6672. Before the plaintiff can be found liable for the trust fund taxes under section 6672, it must be determined whether or not plaintiff Whiteside acted willfully or recklessly, and in disregard of his duty to collect, account for, or pay over trust fund taxes, or willfully attempted in any way to defeat such tax or its payment.

In *White v. United States*, the Court of Claims defined a "willful act" under section 6672 as:

a deliberate choice voluntarily, consciously and intentionally made to pay other creditors instead of paying the Government, and that it is not necessary that there be present an intent to defraud or to deprive the United States of the taxes due, nor need bad motives or wicked design be proved in order to constitute willfulness.

*White*, 372 F.2d at 521; *see also DiStasio*, 22 Cl.Ct. at 47–48; *Powell v. United States*, 9 Cl.Ct. 58, 62 (1985). In addition, "willfulness may be shown by proving that

the responsible person used available corporate money for other business purposes." *Powell v. United States*, 9 Cl.Ct. 58, 62 (1985). "Willful conduct may also include a reckless disregard of an 'obvious and known risk' that taxes might not be remitted." *Godfrey*, 748 F.2d at 1577 (citing *Feist v. United States*, 221 Ct.Cl. 531, 542, 607 F.2d 954, 961 (1979)).

Although "a showing of evil motive, bad purpose, or calculated malevolence" is not required to prove willfulness, *Scott v. United States*, 173 Ct.Cl. 650, 655–56, 354 F.2d 292, 295 (1965), the Federal Circuit in *Godfrey* cautioned, in dicta, that the element of personal fault is not to be ignored, when they directed that the "personal fault" of the plaintiff must be considered when determining the willfulness of the responsible individual's failure to pay trust fund taxes. *Godfrey*, 748 F.2d at 1577. The Federal Circuit cited to the Supreme Court in *Slodov:* "The fact that the provision [section 6672] imposes a 'penalty' and is violated only by a 'willful failure' is itself strong evidence that it was not intended to impose liability without personal fault." *Slodov*, 436 U.S. at 254, 98 S.Ct. at 1788. Because the *Godfrey* court reversed the United States Claims Court on the issue of "responsible person," they never reached the issue of willfulness, and, therefore, did not further define what might constitute personal fault.

"The primary focus of the willfulness test is the taxpayer's diligence in attending to the duty to pay employment taxes." *Hammon*, 21 Cl.Ct. at 27. Nevertheless, willfulness can be proved by showing " 'reckless disregard of a known or obvious risk that trust funds may not be remitted to the Government....' " *Godfrey*, 748 F.2d at 1578 (quoting *Mazo*, 591 F.2d at 1154). The Claims Court, in *Hammon*, stated the test for establishing reckless disregard as follows:

A showing of reckless disregard requires the coincidence of three elements: (1) the responsible person's knowledge (or reason to know) of a risk that taxes will not be paid, (2) a reasonable opportunity to discover and remedy the problem, and (3)

a failure to undertake the reasonable efforts to ensure payment.

*Hammon,* 21 Cl.Ct. at 29–30; *see also Wright v. United States,* 809 F.2d 425, 427 (7th Cir.1987) (stating that liability is established where a responsible person "(1) clearly ought to have known that (2) there was a grave risk that the withholding taxes were not being paid and if (3) he was in a position to find out for certain very easily.") Reckless disregard can be proved when a responsible individual fails to " 'investigate or to correct mismanagement after being notified that withholding taxes have not been duly remitted.' " *Godfrey,* 748 F.2d at 1588 (quoting *Mazo,* 591 F.2d at 1154); *see also Distasio,* 22 Cl.Ct. at 48.

The record establishes that plaintiff Whiteside knew or should have known that there was a serious risk that the withholding taxes for General Freights were owing and were not being paid. At least according to the deposition testimony of Mr. Shirey, Whiteside appears to have been aware of the meeting held in late 1983 or early 1984 with the I.R.S. Although it is probably true, as plaintiff maintains, that no one specifically told him that he was responsible to pay over the trust fund taxes to the I.R.S., it seems clear that the plaintiff also should have known, as a result of his role as the signer on the payroll checks, that the trust fund taxes were due.

Whiteside's own testimony, in fact, makes it abundantly clear that he completely understood the company's trust fund tax obligations:

Mr. Whiteside, you knew, did you not, that as part of the preparation of payroll checks, the federal government had to have his [sic] withholding taxes paid. You were aware of that, were you not?

The plaintiff answered: "I'm aware of that, yes."

The record further establishes that plaintiff Whiteside signed the trust fund tax form filed on behalf of General Freights for the third quarter of 1983, although he tried to make a lame distinction between having signed the return, but not having filed it. It is hard to believe that having signed the trust fund tax return for the quarter immediately prior to the two quarters at issue in this case, that the plaintiff honestly could suggest he did not know that the trust fund taxes were due and owing. The testimony of plaintiff's witness Shirey confirms that Shirey had presented plaintiff with a list of payables, including the tax obligation for the withholding tax, and that Whiteside, therefore, should have been aware of the necessity to pay the taxes.

It is also evident in the record, as discussed more fully above, that plaintiff William Whiteside had control over a significant portion of the General Freights' finances, including the authority to choose which of the many bills at General Freights to pay first. Plaintiff admitted that he did not necessarily discuss the entire list of payables with Mr. Meyers. When plaintiff was asked: "Wasn't it your philosophy that General Freights should pay the squeaky wheel first," plaintiff answered: "The end of the business that I was involved with to keep the trucks rolling, if the wheel squeaked. I had to get paid so I could move freight.... In my end of the business it was, yes." Therefore, as the "custodian" of at least a significant portion of the funds of General Freights, which was in the freight hauling business, it would appear that plaintiff Whiteside could have, and should have, taken steps to ensure that the trust fund taxes were paid over to the United States.

Plaintiff Whiteside had a faulty, or convenient memory, recalling some things very clearly, but not having any recollection of other events. Throughout his testimony, plaintiff William Whiteside was extremely cagey by trying to create narrow but meaningless, and overly slick distinctions in order to wiggle out of responsibility for his actions and for the tax liability at issue here. For example, plaintiff Whiteside tried to distinguish between "signing" the trust fund return for the third quarter of 1983 and "filing" the return. Whiteside admitted signing the return, but denied filing it. Likewise, plaintiff tried to distinguish between not being involved in preparing the payroll, but, nevertheless, admitted

that he had signed many payroll checks, and had signature authority on General Freights' payroll bank documents.

Based on all the evidence presented at trial and the applicable statutory and case law, this court finds that the plaintiff has failed to carry his burden of proof to establish that the Commissioner erred when the assessment in the instant case was issued to the plaintiff.

 Furthermore, it is curious, and probative, under the applicable case law, that the plaintiff chose not to call James Meyers as a witness.[3] Meyers, as President of General Freights, presumably could have testified as to which if any powers he had reserved to himself as President. Meyers also could have offered testimony explaining which employees of General Freights had the responsibility to pay trust fund taxes.

On balance, the plaintiff Whiteside and the witness Shirey were found by the court not to be very credible or probative witnesses. Neither seemed comfortable on the stand, both seemed unduly nervous, even more so than the average witness who has simply not appeared in a courtroom previously. The documentary evidence in the record including the bank signature cards, the signed checks, combined with the testimony, suggest that plaintiff, in particular, was trying to mold his testimony to avoid the legal responsibilities with which he is being charged.

## CONCLUSION

For the reasons discussed above, plaintiff William E. Whiteside is not entitled to any refund. The plaintiff's claim for a refund is, hereby, DISMISSED. The de-

fendant, however, is entitled to the balance of the unremitted trust fund taxes in the sum of $139,963.67. The Clerk of the United States Claims Court is also directed to enter judgment in the amount of $139,-963.67 plus statutory interest and costs, as appropriate.

IT IS SO ORDERED.

---

**3.** A failure to produce evidence can create an inference that, had the evidence been presented, the evidence would establish a case for the opposing party. The particular facts of the case at issue will impact the strength of that inference. As stated in *Interstate Circuit, Inc., et al. v. United States:*

> The production of weak evidence when strong is available can only lead to the conclusion that the strong would have been adverse. *Clifton v. United States* [45 U.S.], 4 How. 242, 247 [11 L.Ed. 957]. Silence then becomes evidence of the most convincing character.

*Runkle v. Burnham,* 153 U.S. 216, 225 [14 S.Ct. 837, 840, 38 L.Ed. 694]; *Kirby v. Tallmadge,* 160 U.S. 379, 383 [16 S.Ct. 349, 350, 40 L.Ed. 463]; *Vajtauer v. Commissioner of Immigration,* 273 U.S. 103, 111, 112 [47 S.Ct. 302, 305, 306, 71 L.Ed. 560]; *Mammoth Oil Co. v. United States,* 275 U.S. 13, 53 [48 S.Ct. 1, 10, 72 L.Ed. 137]; *Local 167 v. United States,* 291 U.S. 293, 298 [54 S.Ct. 396, 398, 78 L.Ed. 804]. *Interstate Circuit, Inc., et al. v. United States,* 306 U.S. 208, 226, 59 S.Ct. 467, 474, 83 L.Ed. 610 (1939); *see also California–Pacific Utilities Co. v. United States,* 194 Ct.Cl. 703, 718 (1971).